STATE of Missouri, at the Relation of HOTEL CONTINENTAL et al.,
Appellants,

v.

Tyre BURTON, Charles Henson, E. L. Mc-Clintock, D. D. McDonald, and William Barton, Members and Comprising the Public Service Commission of Missouri, Respondents.

No. 47529.

Supreme Court of Missouri,

Division No. 1.

March 14, 1960.

Motion to Transfer to Court en Banc Denied April 11, 1960.

Dietrich, Tyler, Davis, Burrel and Dicus, by Ilus W. Davis, Kansas City, Hendren & Andrae, by John H. Hendren, Jefferson City, for relators-appellants.

Glenn D. Evans, General Counsel, Thomas J. Downey, Asst. General Counsel, Public Service Commission, Jefferson City, for respondents.

Spencer, Fane, Britt & Browne, by Irvin Fane, Joseph J. Kelly, Jr., Arthur J. Doyle, Kansas City, and Kyle D. Williams, Jefferson City, for intervenor.

COIL, Commissioner.

This case comes to the writer on reassignment.

In October 1957, Kansas City Power & Light Company, a public utility (herein sometimes called company), filed with respondent Public Service Commission of Missouri (herein sometimes called commission) revised schedules and later substitute revised schedules of rates for steam service. The commission by two orders suspended the proposed tariffs for ten months and investigated and held a hearing to determine whether the proposed rates were excessive or unreasonable. The City of Kansas City (herein sometimes called city) and 41 users of the company's steam service participated in that hearing. The commission's report and order, in effect, approved the new rates for steam service proposed in the substitute revised schedules. The company intervened in the ensuing review proceedings in the circuit court where the order and findings of the commission were affirmed and the 41 users have appealed from the order of affirmance.

Appellants contend, inter alia, that $20,000 of the increase in rates was erroneously authorized because not supported by substantial and competent evidence. Consequently, the amount in dispute gives this court jurisdiction.

Ninety-eight per cent of company's revenue was from the sale of electricity and only two per cent from the sale of steam. The production and sale of steam, however, was conducted as a separate "Heat Department" and as to all pertinent questions on this appeal the company may be considered as selling steam service only. The company's entire distribution of steam was to customers within an area seven blocks square in downtown Kansas City.

The first controversy presented concerns a so-called tax adjustment clause which the company proposed and which the commission approved as a part of the company's tariffs. That tax adjustment provision was: "There shall be added to the monthly bill of the Customer, as separate items, a surcharge equal to the proportionate part of any license, occupation, or other similar fee or tax applicable to steam service by the Company to the Customer, which fee or tax is imposed upon the Company by local taxing authorities on the basis of the gross receipts, net receipts, or revenues from steam sales by the Company."

Appellants contend the foregoing provision makes the commission's order unlawful and unreasonable for several reasons we shall hereinafter notice. Prior thereto, however, we note that the proceedings before the commission was a valuation and rate case wherein the company contended that its rates for steam service approved by the commission in 1951 were not sufficient to provide a fair return on the value of the property used in furnishing such service. The commission found from the evidence that a 5.345 per cent rate of return on the value of the property used was fair and reasonable and that to provide that rate of return, it was necessary that customer billings be increased $139,718 annually, i. e., from $1,118,463 to $1,258,181; that the $139,718 increase included the sum of $75,491, being the annual gross receipts tax (at the then-existing tax rate) payable to the city; that by eliminating (for rate purposes) the $75,491 gross receipts tax item from both gross revenue and operating expense, the resulting rates (those proposed by the company in the substitute revised schedules) would produce the desired 5.345 per cent rate of return if the company was permitted to add each customer's proportionate share of the $75,491 gross receipts tax to each customer's respective bill.

It follows, and appellants make no contrary contention, that if the proposed and approved rate schedules did not, as they do, permit company to collect the money with which to pay the gross receipts tax imposed on it by city in the manner above noted, the company's steam rates would have to be increased sufficiently to provide company

78

with $75,491 additional revenue with which to pay the gross receipts tax, in order to provide the approved rate of return of 5.-345 per cent.

There was evidence that no gross receipts tax had been imposed by city by the time company's rates were (prior to the present hearing) last fixed by the commission in 1951; that in that same year a license tax equal to five per cent and in 1952 an additional tax equal to one half of one per cent of company's gross receipts from the sale of steam were imposed by city; that in 1955 the one half of one per cent was increased to one per cent with an expiration date of June 30, 1958, for both the five and one per cent taxes; that there was no indication that the tax would be reduced but there had been some recent indications that it might be increased.

The company's stated reason for proposing the tax adjustment clause as a part of its rate schedules was to enable its steam customers to receive immediately and automatically the benefit of any reduction in or abolition of such a tax and on the other hand to enable the company to protect itself from attrition of its rate of return due to further increases in the tax rate; both benefits to immediately and automatically accrue without the necessity for a valuation and rate hearing for the sole purpose of adjusting permissible company revenues because of fluctuation in the gross receipts tax rate caused by the city's actions.

The commission's stated ground for approving the tax clause as an integral part of company's rate schedules to accomplish the claimed benefits (which the commission apparently deemed desirable) was that the commission properly could and should determine what items of operating expense were so subject to fluctuation by the actions of governmental agencies uncontrolled by the commission as to substantially affect a rate of return theretofore fixed by the commission and to determine and order how such operating expense item or items should be so treated in determining

rates as to eliminate the effect of such agency action.

In this review our province is to determine whether the commission's order is lawful and, if so, whether it is reasonable and based upon competent and substantial evidence upon the whole record. Section 386.510 (all section citations are to sections of RSMo 1949, V.A.M.S.); Mo.Const. 1945, Art. V, § 22, V.A.M.S.; State ex rel. Chicago, Rock Island & Pacific R. Co. v. Public Service Commission, Mo., 312 S.W.2d 791, 796[3, 4].

Appellants remind us that the commission has only the power and authority specifically conferred upon it by the statutes and such power as may be reasonably necessary to enable the commission to effectively exercise the power specifically granted. State ex rel. and to Use of Public Service Commission v. Padberg, 346 Mo. 1133, 145 S.W.2d 150, 151[3]. Appellants contend there is no statute authorizing or empowering the commission to approve rate schedules containing a so-called tax adjustment clause like the one here in question and that consequently the commission's order is unlawful.

Section 393.290 makes the provisions of the other sections of Chapter 393 (among others) as to the fixing of just and reasonable rates controlling with respect to the present company in so far as those provisions are "practically, legally or necessarily applicable to heating companies * * *." The presently pertinent provisions of Section 393.130 require company's charges for steam to be just and reasonable and not in excess of charges allowed by law or by order of the commission; those of Section 393.140 vest the commission with general supervision of company and with power to determine just and reasonable rates and charges. See State ex rel. Missouri Water Co. v. Public Service Commission, Mo., 308 S.W.2d 704, 716[4]. Section 393.150 provides in part: "Whenever there shall be filed with the commission * * * any schedule stating a new

rate or charge * * * or any new rule, regulation or practice relating to any rate, charge or service * * * the commission shall have, and it is hereby given, authority * * * to enter upon a hearing concerning the propriety of such rate, charge, * * * rule, regulation or practice, and pending such hearing and the decision thereon, the commission * * * may suspend the operation of such schedule and defer the use of such rate, charge, * * * rule, regulation or practice, * * * and after full hearing * * * the commission may make such order in reference to such rate, charge, * * * rule, regulation or practice as would be proper in a proceeding initiated after the rate, * * * rule, regulation or practice has become effective." Section 393.230 empowers the commission to hold valuation and revaluation hearings. Valuations so determined are for consideration in establishing fair values for rate-making purposes, State ex rel. Missouri Water Co. v. Public Service Commission, supra, 308 S.W.2d 719[9], and obviously to enable the commission to determine what charges will permit the utility to make a fair and reasonable return. Section 393.-270, paragraphs 3 and 4 of which seem applicable (although the present hearing was not initiated by defendant as described in Section 393.260 and mentioned in paragraph 1 of Section 393.270, see State ex rel. Missouri Water Co. v. Public Service Commission, supra, 308 S.W.2d 718[8]), provides in paragraph 4 that in determining the price to be charged, in this case for steam, "the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question * * *."

■ A review of the foregoing statutes convinces us that the power expressly conferred by law on the commission to determine the charges for steam which this utility may make in order that its charges to the public will be just and reasonable and at the same time sufficient to enable the utility to earn a fair return, includes the power to authorize a utility as an in-tegral part of its rate schedules to deal with an item of operating expense in a different manner than other such items as part of a pattern or design to accomplish a just and reasonable total charge to the public for its steam service.

The holding in State ex rel. City of West Plains v. Public Service Commission, Mo., 310 S.W.2d 925, 928[1–3], 929[4], was to the same effect in so far as concerned the power and authority of the commission to determine what treatment should be accorded specified expense items in fixing rates. Appellants contend, however, that the opinion in the West Plains case shows that our conclusion there as to the commission's power was erroneous in that it was based upon the commission's express statutory authority to determine the just and reasonable regulations and practices of a utility (there a telephone company) and to fix and prescribe their observance and use; and, say appellants, the rules, regulations, and practices referred to in the pertinent statutes (Section 392.240[2] in the West Plains case), such as those in Section 393.-150 set forth in part above, relate to charges to be made for special services to customers such as, we assume, rules and regulations as to special charges for extending water and gas mains, requiring deposits on equipment or deposits to secure future charges, etc., and that such rules, regulations, and practices do not have anything to do with the "amounts charged for the service" (which we interpret to mean "with the amount of the applicable basic rate"); and that consequently the court in the West Plains case "confused these rules with the statutory powers of the Commission in fixing rates."

■ It is true that the court (in the West Plains case) relied in part upon the provisions of Section 392.240(2), authorizing the commission to fix and order fair and reasonable regulations and practices, in finding power in the commission to authorize the rule there approved as part of the rate schedules, just as in this case we

rely in part upon the provisions of Section 393.150 set forth above for our conclusion that the commission has the power to authorize a utility to treat and bill an item of operating expense in a different manner than other such expense items in fulfilment of its duty to determine just and reasonable rates. It is also true, as appellants contend, that the references in Section 393.150 (and in other pertinent statutes) to rules, regulations and practices do undoubtedly encompass the charges to be made for special services and undoubtedly refer to and govern particular situations with respect to equipment and initial installation costs, etc., but the language of Section 393.150 is not of such limited scope as appellants contend. That section specifically empowers the commission to hold a hearing and to determine the propriety of any new rate or charge set forth in a rate schedule and the propriety of any "new rule, regulation or practice relating to any rate, charge or service" set forth in any rate schedule. We are of the opinion that the so-called tax adjustment clause contained in company's rate schedules whatever it may be called constitutes a "rule * * * or practice relating to" a rate within the meaning of the provisions of Section 393.-150.

■ We make clear, however, that irrespective of the effect of the statutes conferring power on the commission to determine the propriety of rules, regulations, and practices, it was held in the West Plains case, supra, 310 S.W.2d 928[1–3], and we hold here, that the commission's express statutory power to determine and prescribe just and reasonable rates and to determine what rates will permit a fair return, includes the power to determine what items should be included in a utility's operating expense and what items should be excluded, and how excluded items, if any, should be handled and treated, in order that the commission may arrive at a reasoned determination of the issue of "just and reasonable" rates.

■ Appellants say further that the commission's order is unlawful because its approval of the tax adjustment clause is contrary to statutory mandate in that it permits the company to increase or decrease its rates without filing new rate schedules and thereby denies interested parties an opportunity to be heard as to the propriety of the changed rates. This contention makes it desirable to examine the tax clause and its effect under the facts of this case. We repeat the language in question: "There shall be added to the monthly bill of the Customer, as separate items, a surcharge equal to the proportionate part of any license, occupation, or other similar fee or tax applicable to steam service by the Company to the Customer, which fee or tax is imposed upon the Company by local taxing authorities on the basis of the gross receipts, net receipts, or revenues from steam sales by the Company." The foregoing means, as we construe it and as applied to the facts in this case, that each steam customer's share of the present or of any future Kansas City gross receipts tax or of any future city tax based upon the company's customer revenue from steam sales will be shown on each respective customer's bill as a separately stated charge or item.

Thus, as we see it, the tax clause in operation would have two effects: one, it would permit the company to bill in a form that would disclose that a stated part (unfortunately and inaccurately referred to in the order as a surcharge) of the total charge is the customer's proportionate share of the money the company must collect with which to pay the gross receipts tax to the city; and two, it would result in the automatic and immediate adjustment of the customer's total charge in the exact proportionate amount by which any such tax was increased or decreased.

As we have noted, all of company's steam sales are within a 7-blocks-square area in downtown Kansas City. Thus we are here concerned with only one municipality and consequently all of company's customers

pay the same proportionate share of the money which company uses to pay any gross receipts tax imposed on it by city. It seems apparent, then, that in so far as concerns the gross receipts tax in effect at the time of the hearing the commission's order does no more than to permit company to bill its steam customers in a particular manner, i. e., to partially itemize customers' bills. That is true because, as noted, the evidence showed that company's customer billings had to be increased by $139,718 a year to enable company to earn the commission approved 5.345 per cent rate of return and that the $139,718 increase included the annual gross receipts tax of $75,491; consequently, so long as the tax remained the same, each customer's total charge would be exactly the same whether his bill showed two items or only one and whether the tax charge was stated separately or as part of the rate charge. None of appellants' reasons in support of their contention as to unlawfulness being presently considered is applicable to the order in so far as it might apply only to the gross receipts tax in existence at the time of the order and where, as here, all customers resided within the same city. And we see no proper basis for a contention that the order, in so far as it deals only with the then-existing gross receipts tax, is unlawful or unreasonable.

We now consider the order against the contention of unlawfulness in so far as it results in the immediate and automatic adjustment of customer charges in the event of a change in the gross receipts tax. The effect of the order in practical operation would be this: If city reduced or eliminated its gross receipts tax, then automatically and immediately from the effective date of such change, each customer would pay no amount or a proportionately reduced amount as his share of the money which the company would collect with which to pay its gross receipts tax; if the city increased the tax, then automatically and immediately from the effective date of the change, each customer would pay his proportionate share of the increase to enable company to collect sufficient funds with which to pay the increased tax. It is also apparent that no new rate schedules would be filed for the *sole* purpose of reflecting each such tax increase or decrease and that, of course, there would be no opportunity for a hearing on the question whether the company should collect exactly enough money to pay the expense item represented by the changed amount of tax due the city.

We should note at the outset that the order does not, as appellants contend, permit the *company* to increase or decrease its rates. Any such increase or decrease is directed by the *commission's* present order made after a full hearing and no future act or inaction of the *company* can change the effect of that order.

In calculating the operating income which would accrue to company under the proposed rates, the commission eliminated from the company's operating expense the amount of the gross receipts tax ($75,491) and also excluded that same item from operating income. And, as we have heretofore noted, the amount of the gross receipts tax at the then-existing rate was taken into full account by the commission in determining company's just and reasonable rates. Under the present order the amount of the gross receipts tax at any future rate imposed by the city was taken into account ratewise just as certainly and to the same extent as though a new hearing were held each time a different tax rate was fixed. That must be true because under the present order any increase or decrease in the amount of the present tax is automatically adjusted in a manner considered and contemplated by the commission. That is to say, the commission took into consideration the circumstance that the tax might be increased or decreased and provided that the company would gain or lose revenue in an amount exactly equal to the increased or decreased amount necessary to pay the tax item. Consequently, the order operates so that

82

the approved rate of return of necessity remains the same, provided, of course that the *only* substantial change in the company's operation is the gross receipts tax rate, a proviso we shall hereinafter discuss.

No one will deny that the company or any other utility has to pay a valid tax and has to collect the amount of money with which to pay such tax and that the amount (whatever it is and however many changes occur in the amount) of a valid gross receipts tax assessed against the company by the city constitutes an expense of operation in the exact amount of the total of the tax so assessed; that is to say, the amount of an expense item represented by the amount of a valid tax is not affected by economy of operation in other respects or by greater volume of sales or by variations in the amounts of any other expense items. The company must pay the tax, whatever the total amount thereof, and that total is a fixed and unchangeable (unless the city changes the tax rate) operating expense. The only source of the money with which to pay that operating expense is the customer.

The only opportunity for a hearing which is eliminated by the commission's order is the opportunity for a hearing for the *sole* purpose of determining whether to order an increase or decrease in the company's rates exactly sufficient to enable the company to collect exactly enough (more or less) to cover the last increase or decrease in the gross receipts tax. Certainly, and it seems obvious, if the company by reason of economies in operation or due to a decline in the cost of materials and labor or for any other reason earned, under its approved rates, more than a fair return and its rates thereby became unjust and unreasonable, the commission would have the same power it now has and has always had to re-examine the company's rate base; and the appellants and other interested parties would have the same opportunities now afforded them by law to

cause a new investigation of company's rates and to participate in any proceeding involving the justice and reasonableness of company's rates. Clearly, and it should be emphasized, the present order contemplates and deals with a change (up or down) in only one expense item, viz., the gross receipts tax. If changes (up or down) occur in other expense items a new rate hearing may be desirable and nothing in the instant order prevents or in any way affects anyone's right to such new hearing. The commission does not lose supervisory control over company's operation because of the automatic tax adjustment clause contained in the present order. The company's rates are still subject to the commission's supervision. Those rates, however, are not and cannot be affected one iota by the amount of, or any change in the amount of, the money company must collect with which to pay its gross receipts tax, except in the exact amount by which that tax is increased or decreased.

Appellants next contend, perhaps inconsistently with their prior contention that the order permits the *company* to increase the rates, that the order is unlawful because it permits *Kansas City* to exercise the rate-making power conferred by law exclusively on the commission. Appellants, as we understand it, say that by increasing or decreasing or abolishing the tax or by levying a new tax against the company the city could cause an increase in customers' rates and thus the city would be exercising rate-making power. As we have pointed out heretofore, all of company's customers must pay their proportionate shares of the company's gross receipts tax expense item, and that is true irrespective of whether the customer pays his share in response to an itemized or unitemized bill, or under this order or a new one issued each time there is a change in the tax rate. Thus to the extent that the company must collect from its customers the money with which to pay tax it must pay, the city does determine the amount of one of company's expense items and does thereby, indirectly,

determine the proportionate amount each customer must pay. But certainly that obvious fact does not justify the conclusion that the city in any sense determines company's rates or exercises the rate-making power conferred by law on the commission. Whether the company operates under the present order or under an order fixing rates which did not include a tax adjustment clause, the commission in truth and in fact fixes the rates. There is no language in the present order nor any conceivable effect thereof which reasonably may be said to permit a charge upon the public which has not been priorly determined by the commission. The commission has the same power and control over company's rates and may exercise that control as often and as expeditiously under the present order as under one containing no tax adjustment clause. The city by changing the gross receipts tax rate no more exercises rate-making power than does the supplier of coal who raises the price per ton.

Appellants contend further that city is prohibited by law from enacting a sales tax on the consumer and, we suppose, the argument is (although not developed in the brief) that the city by changing the rate of the present gross receipts tax or by enacting a new tax based on company customer revenue, would be levying and collecting a tax in the guise of a tax on the utility, which would be in reality a tax on the customer. It is true that Section 144.-460 prohibits the city from directly or indirectly imposing or collecting a tax on the sale of any service which has been taxed by the state under the sales tax law; and it is also true that the state does tax the sale of service by utilities, e. g., the sale of steam in the instant case. This court has held that a city may lawfully levy a gross receipts tax upon a utility. Thus, if the present tax is lawful because imposed on the company, any new tax (covered by the tax clause) levied by city would be imposed on the utility to the same extent and thus, like the present tax, would be lawful. Under the present tax as well as under any new tax the money with which the company pays or would pay the tax is and always would be paid by the customers; and that is true irrespective of what billing system was used or of how many hearings were held. Thus, if the city changed the rate of the present tax or levied any new tax covered by the tax adjustment clause, there would be no change in the nature of such new or additional tax, no change in the payer of that tax, and no change in the source of the money with which that tax would be paid. The tax adjustment clause does not purport to, and by its operation could not, change the incidence of the present gross receipts tax or the incidence of any new tax based on steam customer revenue.

Appellants next contend that the tax adjustment provision is unlawful for the further asserted reason that "it goes far beyond the specific Kansas City gross receipts tax mentioned in evidence" in that it covers any "license, occupation, or other similar fees or taxes, applicable to steam service, or any tax based on gross receipts, net receipts or revenues from steam sales." Appellants have misread the language of the clause in question. The pertinent language is "any license, occupation, or other similar fee or tax applicable to steam service by the Company to the Customer, *which fee or tax* is imposed upon the Company by local taxing authorities on the basis of the gross receipts, net receipts, or revenues from steam sales by the Company." (Our italics.) It is clear that the clause does not, as appellants say, cover "any tax based on gross receipts, net receipts, or revenues from steam sales" but that it covers only a *license, occupation or other* similar tax which is based on "gross receipts, net receipts, or revenues from steam sales by the Company." It seems clear to us that the language used specifically limits the kind of tax intended to be covered to a license or occupation tax imposed on company by city which license or occupation tax meas-

ures the amount of tax due as a per cent of company's revenue from steam sales to its customers.

For all the reasons stated heretofore, we are of the opinion that the commission's order was not unlawful for any of the reasons asserted by appellants.

The next question is whether the commission's order was reasonable. There was evidence that since 1951 to the time of hearing, June 1958, there had been enacted a five per cent gross receipts tax, increased to 5½ per cent and later (1955) to six per cent; that an officer of the company understood there had been discussion in the city council as to whether to increase the tax when the present six per cent tax expired on June 30, 1958, and that the city was "hard up for revenue" at the time of the hearing; that the only items of operating expense which are directly related to the company's gross revenues are the gross receipts tax and the state sales tax; that those two items fall into a separate category; that the company collects for the state the sales tax which is paid by the customers as a separate item added to the bills; that under the order proposed the gross receipts tax would be separately itemized on the bill but the amount of tax due would be a part of the customer's total cost, i. e., the customer cost is the same whether the gross receipts tax is shown as a separate item or is included in the steam rate as such; that the gross receipts tax is an expense item which well may be dealt with as an item segregated from other expense items; that other tax items (other than sales tax) do not lend themselves to such segregated handling; that the gross receipts tax is subject to change at any time by the city council; that, as noted, the company's purposes in proposing the tax adjustment clause as part of its rate schedules were to give its steam customers the immediate and automatic advantage of any reduction in the gross receipts tax and to automatically prevent company's rate of return from being reduced by an increase in the gross receipts tax, both purposes to be accomplished without the necessity of a valuation and rate hearing each time there is a change in the tax rate for the sole purpose of adjusting company revenues by reason of that change.

There was no evidence adduced by present appellants that the tax adjustment clause contained in the order could not or would not accomplish its stated purposes. While appellants' point I–B in their brief is "The approval of the Tax Adjustment Clause is an unreasonable abuse of discretion by the Commission," their supporting argument is not separately set forth but is purportedly interwoven in a combined argument attacking in the main the lawfulness of the order, the specific points of which we have heretofore considered. The only portion of the argument which may be considered as, although not specifically so designated, pointed toward the question of reasonableness is the contention that the evidence showed that company had lived with a five or six per cent gross receipts tax since 1951 without a tax adjustment clause and, consequently, could do so in the future by exercising its right at any time to file changes in its tariffs made necessary or proper by increased gross receipts taxes. We agree with appellants that, in so far as the present record shows, company could continue to operate as in the past and that it could handle its fluctuations in revenue by reason of an increase or decrease in the tax by successively filing revised schedules of rates. The question, however, as we view it, is not whether the present treatment of the gross receipts tax item is satisfactory and may be satisfactorily continued, or whether the method prior to the present order was also just and fair, or whether one particular treatment of the gross receipts tax item is or might be *better* than another; the question on this aspect of the case is whether the manner of treatment prescribed in the *present order* is reasonable under the evidence.

It is our opinion that the evidence justified the commission's conclusion that the

avowed purposes (set forth heretofore) of the tax adjustment clause were desirable and that the clause would in operation accomplish those purposes. We are of the further view that the inclusion of the tax adjustment clause in company's rate schedules constitutes a method and practice within the commission's power to authorize and which is reasonably calculated to aid in the accomplishment of just and reasonable rates, and consequently we hold the commission's order is reasonable as well as lawful.

What was said in State ex rel. Chicago, Rock Island & Pacific R. Co. v. Public Service Commission, supra, 312 S.W.2d 796 [1, 2], is here appropriate:

"When we consider the purpose of the public service commission act and the specialized functions therein conferred upon the commission, the reasons for limitations upon our power of review are apparent. The public service commission is essentially an agency of the Legislature and its powers are referable to the police power of the state. It is a fact-finding body, exclusively entrusted and charged by the Legislature to deal with and determine the specialized problems arising out of the operation of public utilities. It has a staff of technical and professional experts to aid it in the accomplishment of its statutory powers. Its supervision of the public utilities of this state is a continuing one and its orders and directives with regard to any phase of the operation of any utility are always subject to change to meet changing conditions, as the commission, in its discretion, may deem to be in the public interest. Courts of review perform no such function. They do not examine the record under review for the purpose of determining what order they would have made. As long as the commission acts in accord with due process of law and its findings and decisions do not run afoul of constitutional and statutory requirements and the inherent powers of the courts, it is engaged in an exercise of the police power of the state, with which it is not the province of the courts to interfere. It is, therefore, meaningfully stated in subsection 5 of Section 536.140, as amended in 1953, 'the court shall not substitute its discretion for discretion legally vested in the agency.'"

Most of the remainder of this opinion is a portion of another opinion prepared in this case by another author and is adopted (without quotation marks and with a few minor changes) as a part of this opinion.

■ Appellants next contend that the circuit court erred in affirming the action of the commission in including in the net original cost the reproduction cost and the fair value of the company's property excessive and exorbitant estimates of the company's gross plant additions in the sum of $950,000, and in allowing the company to include in the cost of plant additions an item of $27,100 "interest during construction"; that the report and order of the commission in this respect was unlawful and constituted an unreasonable abuse of discretion. At the time of the hearing (April 3, June 9, and June 10, 1958) the company was engaged in constructing a new high pressure transmission line. It was estimated that the cost of these additions would be $950,000, and that time of completion of the project would be the fall of 1958, in ample time to handle the winter loads of the heat department. On April 30, 1958, $381,700 of the $950,000 had been placed under contract and $216,300 had been expended for materials and labor. Thus a total of $598,000 had been spent or was under contract to be spent. The unspent (and therefore estimated) balance consisted of these items: $141,500 for engineering, supervision, managerial, and accounting expense computed at 18½ per cent of the cost of the work; $27,100 charged as interest during construction; $46,100 to cover contingencies; $52,500 to

cover extras that might be due contractors; $85,000 covering remaining work at the Grand Avenue Station, etc.

Appellants maintain that in rate proceedings involving valuations of property a utility cannot include in the fair value of the property sums not yet spent and which "may never be spent." At the hearing the protesting utility customers opposed the inclusion of these estimated expenses as plant additions, and on this appeal brand them as excessive and exorbitant, and characterize the evidence relating thereto as confusing and unrealistic. At the hearing, however, they offered no evidence to support these charges.

The company introduced evidence that the estimated costs of construction of the gross plant additions were fair and reasonable. This testimony was uncontradicted and unimpeached. On this record there was substantial and competent evidence to support the figure of $950,000 as the estimated costs of gross plant additions. Appellants are particularly critical of the item of $27,100 charged as interest during construction. They say that interest during construction cannot be charged to the estimated cost of facilities; that where interest is capitalized during construction it constitutes a duplicate charge to allow a return on these facilities during the construction period. Many public utility reports and several appellate court decisions are cited in which plant additions during construction have been excluded from the rate base if interest on construction was capitalized. Public Service Commission of Utah v. Mountain Fuel Supply Co., 73 P. U.R. N.S. 428; Southern Bell Tel. & Tel. Co. (1948), Ala., 75 P.U.R. N.S. 298; Re Chesapeake & P. Tel. Co. (1950), District of Columbia, 86 P.U.R. N.S. 379; Re Southern Bell Tel. & Tel. Co. (1951), Ga., 91 P.U.R. N.S. 97; Citizens Tel. Co. v. Public Service Comm. (1952), Ky., 94 P.U.R. N.S. 383, 247 S.W.2d 510; Re New England Tel. & Tel. Co. (1949), Mass., 83 P.U.R. N.S. 238; New Eng-

land Tel. & Tel. Co. v. State (1949), 78 P.U.R. N.S. 67, 95 N.H. 353, 64 A.2d 9; Re Consolidated Edison Co. (1952), N.Y., 96 P.U.R. N.S. 194; Re Southern Bell Tel. & Tel. Co. (1954), Ala., 4 P.U.R. 3d 195; Re Pacific Tel. & Tel. Co. (1954), Cal., 5 P.U.R.3d 396; Re Central Illinois Elec. & Gas Co. (1954), Ill., 6 P.U.R.3d 108. Upon examination, however, it appears that in none of these cases did the utility, in demonstrating the reasonableness of its proposed rates, charge itself with the additional revenues which it was estimated would be derived from the plant additions upon completion of future plant additions. In the instant case the commission used actual operations for the 12-months' period ended May 21, 1957, adjusted for known changes in plant, revenues, expenses, and income after that date. Thus the company was charged with operating revenues adjusted upward to reflect the increased volume of sales estimated after the gross plant additions would be placed in service. Actual revenues for the period stated were adjusted upward $101,-500 to reflect 108,181,000 pounds of additional steam sales for new loads which it was estimated would attach after the close of the test year. Expenses were adjusted downward to reflect labor savings in steam production to result from the retirement of the Wyandotte Station and annual depreciation charges on that station. Other adjustments were made. Plant was adjusted downward some $750,000 to reflect the sale of the office building and land and the retirement of said station which would occur when the plant additions would be placed in service. Having charged the company with the revenues estimated to be received upon completion of the new additions, the commission properly included the item of $950,000 gross estimated plant additions. Baltimore Gas & Elec. Co. v. People's Counsel, 220 Md. 373, 152 A.2d 825.

This case, in which the plant additions were not directly revenue producing, is to be further distinguished from the cases cited by appellants in that in those cases

there was no showing that the plant additions would be placed in service at about the same time the new rates would become effective. Here the rates approved by the commission became effective on September 25, 1958, and it was estimated that the plant additions would be put into service by the heating season which commences October 1. Upon completion the facilities were no longer "plant additions under construction" or "works in progress" but were part and parcel of the plant used and useful in rendering the public service upon which the company had the right to earn a return. Since the plant additions were not to be constructed at some future date after the rates were to become effective but were substantially completed at the date of the hearing and were to be finally completed at about the same time the new rates became effective (we do not notice the five or six-day period of duplication under the rule de minimis), there was no duplication of return in the inclusion of the item of interest during construction. The company would already have incurred the expense of $27,100, the interest required to provide the funds for construction, prior to the time the company could commence to earn a return on such additions. The company was entitled to capitalize that item of expense as a part of the value of the facilities. Baltimore Gas & Elec. Co. v. People's Counsel, supra. It is generally recognized that interest on the money necessarily invested during the period of construction is a part of the cost of the plant, as such properly to be capitalized and added to the rate base. Whitten, Valuation of Public Service Corporations, revised by Wilcox, 2d Ed. (1928), Vol. 1, § 585; Foster, Engineering Valuation of Public Utilities and Factories, Ch. 1, p. 14; Hartman, Fair Value (1920), p. 168; Baltimore Gas & Elec. Co. v. People's Counsel, 1959, 220 Md. 373, 152 A.2d 825, supra; 73 C.J.S. Public Utilities § 18, p. 1017; 43 Am.Jur., Public Utilities and Services, § 117, pp. 654, 655.

■ Finally, appellants contend that the commission's order as to the cost of plant additions is unlawful and an unreasonable abuse of discretion because it is based upon information not in evidence (the staff's findings of the cost of plant additions), as to which appellants were given no opportunity to cross-examine or test its accuracy. At the conclusion of the hearing on June 10, 1958, counsel for the protestants asked that before the closing of the record the commission's staff make a determination of the propriety of the cost of plant additions, a further study of the estimated sales of steam during the coming heating season, in order to have a more complete testing of the proposed rates upon a more realistic basis, and suggested that they have an opportunity to examine these studies and then close the record. The commission denied the request to keep the record open, closed the record, but stated that the record could be reopened, and that it would order the staff to go into this matter if it considered it necessary. The record was not reopened but the commission's engineering staff was directed to check the estimates. In the report and order it was stated that "The Staff, after making a complete study of the estimated expenditures, has reported to the Commission that the applicant's estimate of such expenditures is as close an estimate as can be ascertained at this time." Appellants claim that the commission "based its Report and Order as to the cost of plant additions on the studies made by the staff," and that in considering this study the commission acted in conflict with Section 536.070 which requires that records and documents of the agency to be considered in the case shall be offered in evidence so as to become a part of the record, and that the results of statistical examinations or studies by the staff of the agency are admissible in evidence if the person making the study is present as a witness at the hearing and can testify as to the accuracy of the examination, and provided the witness is subject to cross-examination. Citing 42 Am.Jur.,

Public Administrative Law, § 130, pp. 464–466, and 73 C.J.S. Public Administrative Bodies and Procedure, § 123, pp. 442–444, appellants claim that information secured by independent investigation apart from the hearing and not made known upon the hearing is not evidence properly in the case, and that it is a denial of the fundamentals of a trial for a commission to reach a decision on evidential facts not spread upon the record, and on information secretly collected and not disclosed, which the complaining party has had no opportunity to 'examine, analyze, explain, or rebut.

While the practice disclosed is not recommended or approved, the rights of the appellants have not been prejudiced. The commission did not base its report and order on the studies made by the staff, but upon competent and substantial evidence in the record. The report and order states that the recitals, findings and conclusions are "based on the record herein," clearly referring to the record made at the 3-day hearing. The recital with respect to the staff's report indicates that a report was made and doubtless it was considered by the commission, but the recital does not indicate what weight, if any, the commission accorded the report. In any event, the conclusion of the staff was confirmatory of the evidence adduced at the hearing, so the improperly considered report obviously was merely cumulative and did not affect the commission's order, which is amply supported otherwise by substantial evidence contained in the record, State ex rel. Rice v. Public Service Commission, 359 Mo. 109, 220 S.W.2d 61, 66; Interstate Power Co. v. Federal Power Commission, 8 Cir., 236 F.2d 372, as to which appellants had ample opportunity to cross-examine witnesses and test the accuracy of their evidence. This point is disallowed.

The judgment is affirmed.

HOLMAN, C., dubitante.

HOUSER, C., dissents.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.